**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| CORNELL UNIVERSITY, CORNELL RESEARCH FOUNDATION, INC., *Plaintiffs*, | § § § | Case No. 2:25-cv-00054-JRG-RSP |
| v. | § § | |
| AT&T INC., AT&T ENTERPRISES, LLC, AT&T MOBILITY LLC, AT&T MOBILITY II LLC, AT&T SERVICES, INC., *Defendants*. | § § § § § | (Lead Case) |

# CLAIM CONSTRUCTION ORDER

Before the Court is Plaintiff's Opening Claim Construction Brief (Dkt. No. 104) filed by Cornell University and Cornell Research Foundation, Inc. ("Cornell"). Also before the Court is the Defendants' Responsive Claim Construction Brief (Dkt. No. 109) filed by AT&T Enterprises, LLC, AT&T Mobility LLC, AT&T Mobility II LLC, AT&T Services, Inc., Cellco Partnership d/b/a Verizon Wireless, Verizon Business Network Services LLC, and Verizon Corporate Services Group, Inc. ("Defendants"), along with Plaintiff's Reply Claim Construction Brief (Dkt. No. 113).

The Court held a hearing on March 24, 2026. Having considered the parties' briefing, submitted evidence, and heard arguments from counsel, the Court resolves the disputes as ordered herein.

## I. BACKGROUND

Plaintiff alleges infringement of two patents: U.S. Patent No. 7,839,775 ("the '775 Patent") and U.S. Patent No. 7,965,733 ("the '733 Patent") (collectively, "the Asserted Patents"). The Asserted Patents relate to wireless communications technology, specifically methods and systems for enabling multiple terminals to transmit data packets simultaneously over a shared channel.

The '775 Patent is titled, "Methods and Systems for Channel Sensing Multiple Access Communications with Multipacket Reception," and its Abstract sets forth as follows:

> Methods and Systems for communication using carrier sense multiple access (CSMA) with multipacket reception (MPR).

The '733 Patent is titled, "Systems and Methods to Detect and Avoid Collisions in Channel Sense Multiple Access Communications with Multipacket Reception," and its Abstract sets forth as follows:

> Methods and systems to perform collision detection (CD) in a communication network are disclosed. Methods and systems over multipacket reception (MPR)-capable physical layers are also disclosed. In one embodiment, the method for transmitting information in a network includes the steps of initiating transmission over a communication channel, monitoring a feedback channel, modifying transmission parameters for the transmission over the communication channel (where modifying includes stopping transmission and adjusting transmission parameters), if a feedback transmission is detected while monitoring the feedback channel, a duration of the feedback transmission being smaller than duration of the transmission over the communication channel, and determining whether transmission was successful, if transmission continues after modifying transmission parameters. Other embodiments of methods for transmitting and receiving information, as well as systems that implement the methods, are also disclosed.

## II. LEGAL STANDARDS

"'[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) (quoting *Innova/Pure-Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).

"[T]he court has the power and obligation to construe as a matter of law the meaning of language used in the patent claim." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*); *aff'g,* 517 U.S. 370, 390 (1996).

To ascertain the meaning of claims, courts look to three primary sources: the claims, the specification, and the prosecution history. *Markman*, 52 F.3d at 979. The specification must contain a written description of the invention that enables one of ordinary skill in the art to make and use the invention. *Id.* A patent's claims must be read in view of the specification, of which they are a part. *Id.* For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims. *Id.* "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

When construing claims, "[t]here is a heavy presumption that claim terms are to be given their ordinary and customary meaning." *Aventis Pharm. Inc. v. Amino Chems. Ltd.,* 715 F.3d 1363, 1373 (Fed. Cir. 2013) (citing *Phillips,* 415 F.3d at 1312–13). Courts must therefore "look to the words of the claims themselves . . . to define the scope of the patented invention." *Id.* (citations omitted). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.,* as of the effective filing date of the patent application." *Phillips,* 415 F.3d at 1313. This "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*

There are, however, two exceptions to this rule. The first exception is when a patentee sets out a definition and acts as his own lexicographer. The second exception is when the patentee

disavows the full scope of a claim term either in the specification or during prosecution. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1580 (Fed. Cir. 1996).

The patentee is free to be his own lexicographer, but any special definition given to a word must be clearly set forth in the specification. *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1388 (Fed. Cir. 1992). As the Supreme Court stated long ago, "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims." *Bates v. Coe*, 98 U.S. 31, 38 (1878). Although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiments. *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

But "[w]here the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question." *Scimed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001). "The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). "Absent a clear disavowal in the specification or the prosecution history, the patentee is entitled to the full scope of its claim language." *Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1358 (Fed. Cir. 2004). A disavowal or disclaimer must be clear and unmistakable. *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1366-67 (Fed. Cir. 2012).

The prosecution history also continues to play an important role in claim interpretation. Like the specification, the prosecution history helps to demonstrate how the inventor and the United States Patent and Trademark Office ("PTO") understood the patent. *Phillips*, 415 F.3d at 1317. Because the file history, however, "represents an ongoing negotiation between the PTO and the applicant," it may lack the clarity of the specification and thus be less useful in claim construction proceedings. *Id.* Nevertheless, the prosecution history is intrinsic evidence that is relevant to the determination of how the inventor understood the invention and whether the inventor limited the invention during prosecution by narrowing the scope of the claims. *Id.*; *see Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004) (noting that "a patentee's statements during prosecution, whether relied on by the examiner or not, are relevant to claim interpretation").

Intrinsic evidence, therefore, is the primary resource for claim construction. *See Power-One, Inc. v. Artesyn Techs., Inc.,* 599 F.3d 1343, 1348 (Fed. Cir. 2010) (citing *Phillips,* 415 F.3d at 1312). But for claim terms with less-apparent meanings, courts consider " 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean[,] [including] the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.' " *Phillips,* 415 F.3d at 1314 (quoting *Innova*, 381 F.3d at 1116). In those situations, "the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 320 (2015) (citation omitted). "In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual

findings about that extrinsic evidence. These are the 'evidentiary underpinnings' of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal." *Id.* (citing 517 U.S. 370).

However, the intrinsic record may not be sacrificed in favor of extrinsic evidence. According to *Phillips*, reliance on dictionary definitions, for example at the expense of the specification had the effect of "focus[ing] the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." *Id.* at 1321.

The Supreme Court of the United States has "read [35 U.S.C.] § 112, ¶ 2 to require that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910, 134 S. Ct. 2120, 2129 (2014). "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Id.* The claims "must be precise enough to afford clear notice of what is claimed," but that consideration must be made while accounting for the inherent limitations of language. *Id.* at 908. "Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

## III. AGREED TERMS

The parties have submitted no agreed terms.

## IV. DISPUTED TERMS

### 1. "monitoring subsystem"

| Claim term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "monitoring subsystem determining whether signal energy on a communication channel exceeds a predetermined amount" and related monitoring subsystem terms<br><br>('775 Patent, Claims 1, 26, 44, 51, 56, 59) | No construction necessary; plain and ordinary meaning. Not governed by § 112 ¶ 6.<br><br>In the alternative, to the extent §112, ¶ 6 is applicable, the claimed functions correspond to the monitoring subsystem 430 of Figure 6, including its interfaces with physical layer 420 and control subsystem 450, and equivalents thereof. | Indefinite, means-plus-function term under pre-AIA §112, ¶ 6<br><br>**Function**: "determining whether signal energy on [said/a] communication channel exceeds a predetermined amount" (claims 1, 26; analogous functions in claims 44, 51, 56, 59).<br><br>**Structure**: No structure disclosed; indefinite.<br><br>Alternatively, if structure found: energy detector that determines whether the number of terminals transmitting on the channel is less than a threshold as described at '775 Patent 6:49–61. |

The dispute as to this term is whether "monitoring subsystem" is a nonce word that invokes means-plus-function claiming under 35 U.S.C. § 112(6), or whether it connotes sufficiently definite structure to a person of ordinary skill in the art ("POSITA") when read in the full context of the claim and the intrinsic record.

Plaintiff argues that the presumption against § 112(6) applies because the claim does not use the word "means." Plaintiff contends that "monitoring subsystem" is not a nonce word but rather a recognized structural designation in MAC/PHY architecture in the OSI network

communication model. In Plaintiff's view, the term is analogous to "subsystem," "component," "transmitter," and "receiver," which denote modular, interconnected hardware and software blocks in MAC/PHY architectures consistent with IEEE 802.11, § 5.2.2. Plaintiff further argues that the structural nature of the term is confirmed by its placement within Claim 1's multi-component architecture, in which each terminal comprises three named, co-equal hardware blocks (a monitoring subsystem, a packet-generating component, and a control subsystem) that interact through defined information flows. In the alternative, if § 112(6) is found to apply, Plaintiff contends that monitoring subsystem 430 of FIG. 6, including its interfaces with physical layer 420 and control subsystem 450, and equivalents thereof, constitutes the corresponding structure.

Defendants argue that "monitoring subsystem" is a nonce word devoid of particular structure, which makes it analogous to reciting a "means for" performing a function within the purview of § 112(6). Defendants rely on *In re McFadden*, No. 2024-2107, 2025 U.S. App. LEXIS 22956 (Fed. Cir. 2025) (nonprecedential), for the proposition that "subsystem," like "means," is a term devoid of structure. Defendants argue that the modifier "monitoring" adds no structural significance and merely describes the function the placeholder performs. Defendants further contend that the specification describes the monitoring subsystem only functionally by what it does and not by what it is. Defendants reject Plaintiff's architectural interaction argument, asserting that placement within a multi-component system does not supply structural content to an otherwise functional term. If § 112(6) applies, Defendants argue that the only structure the inventor identified during prosecution was an energy detector at col. 6:49–61, but contend that "energy detector" is itself a functional term, not a structure or class of structures, and that the term is therefore indefinite.

Under *Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) (en banc), there is a rebuttable presumption that § 112(6) does not apply when the word "means" is absent from the claim. *Id.* at 1348. That presumption is overcome if the challenger demonstrates by a preponderance of the evidence that the term "fails to recite sufficiently definite structure" or "recites function without reciting sufficient structure for performing that function." *Id.* at 1348-49. The inquiry focuses not on the term in isolation but on "whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Id.* at 1348; *Dyfan, LLC v. Target Corp.*, 28 F.4th 1360, 1365 (Fed. Cir. 2022). A term may connote structure "even if the term identifies the structures by their function." *Skky, Inc. v. MindGeek, S.A.R.L.*, 859 F.3d 1014, 1019 (Fed. Cir. 2017) (citation and quotation omitted). The Court notes that while Plaintiff has characterized the presumption as "strong," that characterization was abrogated by *Williamson* and does not control the analysis here.

The Court begins its analysis by first examining the claim language. Claim 1 is representative in its use of the disputed term. Claim 1 reads as follows, with the disputed term highlighted in bold:

> 1. A data communication system comprising:
>
> a plurality of terminals connected to a communication channel, each terminal transmitting signals onto said communication channel, and receiving signals transmitted on said communication channel by other terminals, said receiving comprising separating and substantially decoding the signals simultaneously transmitted by multiple other terminals, each terminal comprising:
>
>> a **monitoring subsystem** determining whether signal energy on said communication channel exceeds a predetermined amount;
>>
>> a component generating and processing network data packets; and
>>
>> a control subsystem that accepts said network data packets from said component and determines a manner in which to transmit said network data packets over said communication channel; said control subsystem

> enabling a plurality of said network data packets to be successfully transmitted simultaneously on said communication channel.

As recited, the claim language materially distinguishes the "monitoring subsystem" from bare nonce-word cases. It recites a data communication system containing multiple terminals, in which each terminal comprises three named, co-equal structural blocks: (1) a monitoring subsystem to make a determination of energy level on a communication channel, (2) a component generating and processing network data packets, and (3) a control subsystem that transmits network data packets over a communication channel. These three elements interact through defined information flows within each terminal, which are themselves physical structures. The "monitoring subsystem" is not an isolated functional placeholder. Rather, it is a named component of a hardware system that receives and reports channel-state information to the control logic.

Dependent claims reinforce this structural reading. Claim 8 recites that the monitoring subsystem "determines whether an estimate of a number of terminals transmitting simultaneously over the communication channel exceeds a predetermined amount," and that upon such determination "said control subsystem prevents the terminal from transmitting onto said communication channel." Claim 10 adds that the monitoring subsystem, upon the same determination, "further comprises delaying transmission for a backoff duration." These dependent claims describe concrete behavioral attributes and inter-component information flows that are attributes of a hardware element having a defined architecture.

The specification also discloses the claimed mechanism in concrete structural terms. Describing the receive process, the specification states that "the receiver will start monitoring the channel for transmissions (FIG. 3, Step 170) and decide whether one or more transmissions have begun (FIG. 3, 175). This can be achieved, for instance, by detecting an increase of signal energy in the channel." ('775 Patent at 5:53–56.) This passage does not describe an abstract function. It

describes the operation by which a receiver structure performs monitoring, which directly corresponds to the claim language.

The specification further discloses specific structural implementation: "the terminals are equipped with energy detectors that can form an estimate N of the number of terminals transmitting over the channel. During channel sensing, each terminal forms its estimate N from its received signal energy 300. As long as a terminal's N is less than n* [the capacity of the channel] 310, then that terminal can start transmission 315. But if N is greater than n* 305, then the terminals will backoff for duration T 145." ('775 Patent at 6:49–56.) This passage identifies the physical terminals as being equipped with "energy detectors" as named components that perform signal energy measurement. Significantly, this is the passage Cornell relied upon during prosecution in response to the examiner's enablement rejection, as well as in the 2017 *ex parte* reexamination request to establish priority. Accordingly, it forms the basis for how a skilled artisan would know how to practice the invention and weighs in favor of finding structure.

Moreover, the specification equates the monitoring subsystem with known prior art CSMA structures: "The transmitter/receiver 440 and the monitoring subsystem 430 can be, in one embodiment, but are not limited to, similar to subsystems used in CSMA without MPR (see, for example, U.S. Pat. Nos. 6,157,616, and 6,181,683 . . .)." ('775 Patent at 7:39–57.) This passage establishes that the monitoring subsystem is not a novel invention requiring structural definition from scratch. Instead, it is an existing and well-known structural component of CSMA systems that the inventors adapted for use in an MPR context. The specification further cross-references the '616 Patent, whose Figure 3 block diagram is described in detail by Defendants' own expert as depicting a concrete receiver architecture with named discrete hardware components (a demodulator 330, a carrier detector 332, and a carrier sense decision unit 334) "that together

analyze the received signal wave" to determine whether signal strength warrants deferral. (Dkt. No. 109-2, ¶¶ 65–66). Under established Federal Circuit authority, material incorporated by reference becomes part of the host patent's specification. *Advanced Display Sys. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000). The incorporated reference is thus itself strong structural disclosure. Mr. Carpenter's conclusion that the cross-reference establishes "no known structure" for the monitoring subsystem is inconsistent with the architecture the '616 Patent actually depicts. (*Id.*, ¶ 67.)

Defendants cite *In re McFadden* for the proposition that the claim term "subsystem" must be "devoid of particular structure." The Court, however, does not find *McFadden* to be controlling on the facts of this case. The claim in *McFadden* ("a subsystem configured to use the method of claim 1 to determine an include region for a second user of the social network") involved a limitation with no structural modifier, no named co-components, and no defined inter-component interactions anywhere in the claim. 2025 U.S. App. LEXIS 22956 at *6. The Federal Circuit's holding there was a function of those particular claim characteristics and does not act as a categorical rule that all "subsystem" limitations fail to connote structure.

Here, the claim does not recite an isolated functional placeholder. It recites a physical terminal comprising three named hardware blocks that interact through defined information flows. "Monitoring subsystem" is not performing the structural work of "means." Instead, it occupies a defined architectural position alongside the packet-generating component and the control subsystem. Moreover, the physical terminal environment anchors the structural reading because components that physical terminals "comprise" are themselves physical components. The claim context is fundamentally different from that addressed in *McFadden*, and that decision does not control the outcome here.

The Court has evaluated the experts' testimony and determines that it confirms a finding that "monitoring subsystem" has a known structure in the telecom arts. Plaintiff's expert, Dr. John Kowalski, opines that "monitoring subsystem" in MAC/PHY architecture refers to "a portion of a wireless transceiver that senses received signal energy and determines if it exceeds a threshold," and that this understanding "was well established at the time of the inventions" under IEEE 802.11 standards. (Dkt. No. 104-2, ¶¶ 25–26.) Dr. Kowalski identifies the structure as "software and/or hardware within the MAC-layer and PHY-layer that is configured to sense the signal energy of transmissions on a communication channel, determine whether they exceed a predetermined amount." (*Id.* ¶ 35.) He further opines that no algorithm is required because the function is performed by "dedicated MAC-layer circuitry and PHY-layer interface for carrier sensing and energy threshold detection." (*Id.* ¶ 39.)

Defendants' expert, Mr. Paul Carpenter, corroborates Dr. Kowalski's opinion in part. At paragraphs 86–87 of his declaration, Mr. Carpenter concedes that around the priority date, energy detection "would typically be implemented in dedicated hardware" such as FPGAs or ASICs because the function "requires continuous sample-rate processing with deterministic microsecond-scale timing, low power operation during idle listening, and tight integration with RF/baseband functions such as carrier sensing thresholds." (Dkt. No. 109-2 ¶ 87.) A function that "would typically be implemented in dedicated hardware" with those specific hardware integration requirements is not a vague functional placeholder. It is a recognized class of specialized hardware. Mr. Carpenter's own account at paragraph 87 reads as a technical description of the carrier-sense circuit block depicted in the '616 Patent's Figure 3. This concession materially undermines his conclusion that "energy detector does not refer to a structure or class of structures." (*Id.*, ¶ 91.) Additionally, Defendants' expert in the co-pending *ex parte* reexamination proceeding, Dr. Paul

Min, had no difficulty applying "monitoring subsystem" to structural components in wireless transceivers. (*See* Dkt. No. 113-1.)

On weighing the submitted evidence, the Court finds Dr. Kowalski to be more credible on this point. The intrinsic and extrinsic evidence collectively demonstrates that a POSITA would recognize "monitoring subsystem" as the name for the carrier-sensing and energy-detection block of a wireless[1] transceiver, which is a structural component with well-established hardware implementations in the relevant art at the time of the invention.

Accordingly, Defendants have failed to overcome the presumption against means-plus-function treatment. When read in the full context of the claims and specification, "monitoring subsystem" connotes a sufficiently definite name for structure to a POSITA. The intrinsic record, the incorporated prior art structures, and the convergent expert testimony confirm that the carrier-sensing and energy-detection functions recited in the claim map to a recognized structural class in the wireless transceiver art. Section 112(6) does not apply, and no further corresponding structure or algorithm analysis is required.

For the foregoing reasons, the Court finds that **"monitoring subsystem" and the related monitoring subsystem terms are not governed by 35 U.S.C. § 112(6).** The Court construes these terms according to their **plain and ordinary meaning**. No further construction is necessary.

---

[1] Defendant argued during the hearing that there is no limitation in the claims to a wireless transceiver. However, the Court notes that claim 23, which depends from claim 1, expressly recites "wherein said communication channel comprises a wireless channel." And the specification contains extensive discussions of the IEEE 802.11 standard, which is specific to wireless networks.

### 2. "[a] component generating and processing [network] data packets"

| Claim term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "[a] component generating and processing [network] data packets"<br><br>('775 Patent, Claims 1, 26, 51, 56) | No construction necessary; plain and ordinary meaning. Not governed by §112, ¶ 6.<br><br>Alternative (if §112, ¶ 6 applies):<br><br>Function corresponds to module 460 of Figure 6, including its interface to control subsystem 450, and equivalents. | Indefinite, means-plus-function under pre-AIA §112, ¶ 6.<br><br>**Function**: "generating and processing [network] data packets."<br><br>**Structure**: none disclosed; indefinite. |

The dispute as to this term is whether "component" is a nonce word that invokes means-plus-function claiming under 35 U.S.C. § 112(6), and, if so, whether the specification discloses adequate corresponding structure in module 460 in FIG. 6 of the '775 Patent.

Plaintiff argues that the presumption against § 112(6) stands because "component" is not a standalone abstraction but one of three co-equal architectural blocks in a multi-component transceiver interacting with the monitoring subsystem and control subsystem through defined information flows. Plaintiff contends that the claim architecture in which a terminal in a data communication system comprises three named, interacting elements constitutes "significant indicia of the structural nature" of the limitation, citing *Huawei Techs. Co. v. Verizon Commc'ns, Inc.*, No. 2:20-cv-00030-JRG, 2021 WL 150442, at *12 (E.D. Tex. Jan. 15, 2021) ("*Huawei I*"). Plaintiff further argues that the specification confirms the element refers to a concrete packet-generating and packet-processing structure, pointing to FIG. 6 which depicts module 460 as a labeled structural block within the transceiver, and to contemporaneous technical literature relied

on by its expert. On that basis, Plaintiff asserts that a POSITA would understand this term as referring to packet-processing components that were well-known structures in 802.11 MAC architecture at the time of the invention.

Defendants respond that "component" is a confirmed nonce word under *Williamson*, which lists "mechanism," "element," "device," and "module" as paradigmatic functional placeholders. Defendants argue the specification uses "component" and "module" interchangeably, and that module is itself a confirmed nonce word, so neither term names a structure. Defendants further contend that the implementation of generating and processing network data packets varies extensively across system types, encoding schemes, and transmission parameters, and that the '775 Patent does not disclose MAC-layer architecture because the MAC layer is a functional abstraction. Defendants argue the term is therefore indefinite for lack of corresponding structure.

The Court begins its analysis by noting the rebuttable presumption that § 112(6) does not apply when the word "means" is absent, rebuttable by a preponderance showing that the term "fails to recite sufficiently definite structure" or "recites function without reciting sufficient structure for performing that function." *Williamson*, 792 F.3d at 1348–49. The inquiry asks whether the term, read in context of the claim as a whole, is "understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Id.* at 1348. A term "need not connote a single, specific structure"; it suffices if it designates a recognized class of structures within the relevant art. *Dyfan*, 28 F.4th at 1370.

Although "component" standing alone would warrant scrutiny as potentially generic, the word does not appear in isolation. It appears as one of three named architectural elements within a physical terminal of a data communication system. Claim 1 recites that each terminal comprises: (1) "a monitoring subsystem determining whether signal energy on said communication channel

exceeds a predetermined amount"; (2) "a component generating and processing network data packets"; and (3) "a control subsystem that accepts said network data packets from said component and determines a manner in which to transmit said network data packets over said communication channel." The control subsystem explicitly "accepts said network data packets from said component"—a defined information flow between named architectural blocks that identifies the component's position and role in the system with structural specificity.

The Federal Circuit has held that inter-component interactions of precisely this kind constitute "significant indicia of the structural nature" of a claim limitation. *Huawei I,* 2021 WL 150442, at *12 (rejecting means-plus-function treatment where claim "units and subunits interacted to achieve the claim-recited objectives"). The element at issue here is not a free-floating functional description. Rather, it is a named constituent of a multi-component hardware terminal that generates and processes packets, delivers them to a named co-component (the control subsystem), and operates within a defined transceiver architecture. That architectural positioning supplies structural content that "component" alone would not carry. Defendants' analysis treats "component" as if it appeared in a vacuum, divorced from the claim architecture in which it is embedded. Such an approach is incorrect. *Williamson* requires the Court to assess "the words of the claim" and not a single word in isolation. 792 F.3d at 1348.

At oral argument, Defendants stated that the '775 Patent does not disclose MAC-layer architecture, in an effort to dispel the structural context in which the claims reside. But that ignores the patent's own recited Background of the Invention. The specification opens by situating the invention squarely within the IEEE 802.11 wireless LAN context. It describes the interplay between the physical (PHY) layer and the multiple access control (MAC) layer, explains that the invention applies "cross-layer design for networks with multipacket reception (MPR) capabilities"

to CSMA communications, and expressly notes that "CSMA was chosen as the MAC layer's access method" in the IEEE 802.11 WLAN standards. ('775 Patent at 1:15–24; 1:56–62.) The invention is, by the patentee's own description, a cross-layer MAC/PHY design operating within the IEEE 802.11 framework.

The patentee is not required to re-describe the MAC architecture in detail when it is already common knowledge in the art. Patent specifications need not disclose what is well known. Generating and processing network data packets is predicate to the patented inventive concept and is the baseline function that any MAC-layer transceiver must perform. It is the information that is sent and received, without which, there would be no reason to improve performance. And the patent drafter treated such a structure as known, That much is evident from the background contextualization reciting the common, unremarkable elements of terminal architecture as something not requiring structural elaboration. Defendants' argument that no structure is known for generating and processing packets within an 802.11 MAC-layer transceiver is divorced from the state of the art at the time of the invention. It is not persuasive.

The extrinsic record confirms that packet-generating and packet-processing blocks were standard structural components of 802.11a transceiver MAC architecture. Dr. Kowalski identifies two contemporaneous technical publications that depict this architecture in concrete hardware terms. The Thomson article, *An Integrated 802.11a Baseband and MAC Processor* (2002), depicts at Figure 7.2.2 the TX FIFO portion of the Protocol Control Unit (PCU), which is expressly responsible for receiving network data packets from the DMA for transmission processing. (Dkt. No. 104-2, ¶ 45.) The Meng article, *Design and Implementation of an All-CMOS 802.11a Wireless LAN Chipset*, IEEE Communications Magazine (Aug. 2003), contains the same figure and the same TX FIFO description within the PCU architecture. (Dkt. No. 104-2, ¶ 46.) Dr. Kowalski

opines that these structures (packet buffers, frame generators, TX FIFOs, and associated MAC control logic) were well known and widely implemented in wireless transceivers at the time of the invention. (*Id.*)

Accordingly, a review of the evidence establishes that "a component generating and processing network data packets" had a well-understood structural referent in the art at the time of the invention. A POSITA encountering this claim term within an 802.11 MAC/PHY design would immediately recognize it as referring to a class of structure, as Dr. Kowalski did.

Indeed, Defendants' own expert does not dispute that known structures exist for generating and processing network packets in a MAC-layer transceiver. Mr. Carpenter states only that "there are many ways to implement" this function. (Dkt. No. 109-2, ¶ 101.) But the existence of variations does not establish that the term lacks structural content. Instead, it establishes that the recognized structural class encompasses multiple implementations—precisely what *Dyfan* holds is sufficient. 28 F.4th at 1370.

Defendants argue that because "module" is a confirmed nonce word under *Williamson*, and because the specification uses "component" and "module" in proximity when referring to the same element, "component" must likewise be a nonce word. The Court disagrees. The relevant inquiry is not whether synonymous terms in the specification include nonce words, but whether the claim term itself connotes structure to a POSITA. The claim uses "component," not "module." And "component," in the specific architectural context of this claim is a recognized structural class and not an empty placeholder.

The Court further notes that the claim term at issue in *Williamson* was "distributed learning control module" in a software patent with no hardware architectural context and no named co-components through which the module interacted. 792 F.3d at 1351–52. The structural deficit in

that case arose from the absence of any architectural grounding. Here, in contrast, the architectural grounding is extensive. A defined hardware terminal, three named interacting elements, a cross-layer MAC/PHY design context set out in the patent background, and a contemporaneous art base in which the relevant component was a standard hardware block. *Williamson* does not control the conclusion reached here.

For the foregoing reasons, Defendants have not overcome the presumption against means-plus-function treatment. Read in the full context of the claim, "[a] component generating and processing [network] data packets" connotes a sufficiently definite class of structures to a POSITA. It is the packet-generating and packet-processing block of a MAC-layer wireless transceiver of the type well known in the art and depicted in contemporaneous 802.11a chipset literature. Section 112(6) does not apply.

The Court therefore finds **"[a] component generating and processing [network] data packets" is not governed by 35 U.S.C. § 112(6).** The Court construes the term according to its **plain and ordinary meaning**. No further construction is necessary.

### 3. "control subsystem" / "control component"

| Claim term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "control subsystem that accepts said network data packets from said component and determines a manner in which to transmit said network data packets over said communication channel . . ." and related terms<br><br>('775 Patent, claims 1, 2, 3, 7, 15, 16, 17, 18, 19, 24, 25, 26, 27, 28, 36, 37, 38, 43, 51, 52, 53, 54, 56, 57, | No construction necessary; plain and ordinary meaning. Not governed by §112, ¶ 6.<br><br>Alternative (if §112, ¶ 6 applies):<br><br>Claimed control functions correspond to control subsystem 450 of Figure 6 and its interfaces, and equivalents thereof. Although no algorithm is | Indefinite, means-plus-function under pre-AIA §112, ¶ 6.<br><br>**Function**:<br>"accepts said network data packets from said component and determines a manner in which to transmit said network data packets over said communication channel" (claims 1, 26)<br><br>"enabling a plurality of said network data packets to be successfully transmitted |

| | | |
|---|---|---|
| 58)<br><br>"control component . . . "<br><br>('775 Patent, claim 44) | required, sufficient algorithmic structure is disclosed in at least Figs. 1, 2, 4 and/or 5 | simultaneously on said communication channel [with other data packets transmitted by at least one other terminal and, if it has been determined that said signal energy exceeds said predetermined amount, does not allow the terminal to begin to transmit on said communication channel]" (claims 1, 26)<br><br>"if it has been determined that said signal energy exceeds said predetermined amount, [said control subsystem] prevents [said each terminal / the terminal system / the terminal] from transmitting [onto / on] said communication channel" (claims 2, 27, 44)<br><br>"if it has been determined that said signal energy exceeds said predetermined amount, delays transmission for a backoff duration" (claims 3, 43, 54)<br><br>"determines said backoff duration and the timing of allowing transmission on said communication channel in relation to a timeslot" (claim 7)<br><br>"enables multiple simultaneous transmissions to be present in said communication channel by multiple input multiple output signalling" (claims 15, 36, 52, 57)<br><br>"enables multiple simultaneous transmissions to be present in said communication channel by at least one of space-time coding, spread spectrum modulation, frequency hopping or multiple access coding" (claims 16, 37, 53, 58) |

| | | |
|---|---|---|
| | | "notifies transmitting terminals of successful reception" (claim 17)<br><br>"determines whether transmission was successful" (claim 18)<br><br>"if transmission was not successful, initiates retransmission" (claim 18)<br><br>"modifies a manner in which to transmit in order to improve the probability of successful transmission" (claims 19, 38)<br><br>"determines successful reception of said multiple simultaneous transmissions" (claim 24)<br><br>"notifies transmitting terminals of successful reception" (claim 25)<br><br>"receiving of multiple simultaneous transmissions on said communication channel" (claim 28)<br><br>"accepts said data packets from said component and determines a manner in which to successfully transmit said data packets over said communication channel simultaneously with other data packets transmitted by at least one other terminal and, if it has been determined that said signal energy exceeds said predetermined amount, does not allow the terminal to begin to transmit on said communication channel" (claim 51)<br><br>"accepts said network data packets from said component and determines a manner in which to transmit said network data packets |

| | | |
|---|---|---|
| | | over said communication channel simultaneously to a plurality of receiving systems" (claim 56)<br><br>"determining a manner in which to transmit network data packets over said communication channel and enabling a plurality of said network data packets to be transmitted simultaneously on said communication channel, by a control component in the terminal, said plurality of said network data packets being successfully transmitted simultaneously" (claim 44)<br><br>**Structure**: No structure disclosed and thus indefinite. |

The third disputed term encompasses (1) "control subsystem" and related terms appearing in Claims 1, 2, 3, 7, 15, 16, 17, 18, 19, 24, 25, 26, 27, 28, 36, 37, 38, 43, 51, 52, 53, 54, 56, 57, and 58 of the '775 Patent, and (2) "control component" as used in Claim 44. The Court addresses each term in turn. Both are arguments on the application of § 112(6).

Plaintiff contends that § 112(6) does not apply because "control subsystem" is not a nonce word but a compound designation that identifies the element's structural role within a defined system. Plaintiff points to a contemporaneous technical dictionary defining "control subsystem" as "the hardware and software that make up a controller," *Dictionary of Computer Science, Engineering and Technology* (2001), p. 106, and to case law finding similar terms to be structural. *Cellular Commc'ns v. HTC Corp.*, 2018 WL 316472, at *15 (E.D. Tex. Jan. 8, 2018) ("control unit" connotes structure); *Canon, Inc. v. TCL Elecs. Holdings Ltd.*, 2020 WL 2098197, at *13, *50 (E.D. Tex. May 1, 2020) ("control unit for controlling" structural). In the alternative, Plaintiff

identifies control subsystem 450 of FIG. 6 and its interfaces as the corresponding structure, and argues that FIGS. 1, 2, 4, and 5 supply sufficient algorithmic structure for the transmission-control decision logic.

Defendants disagree, arguing that "control subsystem" is means-plus-function claiming because "subsystem" is a nonce word, and the modifier "control" does not add structure where the specification discloses the control subsystem as implementable in any combination of hardware and software. Defendants rely on the embodiment at col. 8:19–29, with the disclosure that "control subsystem 450 includes one or more processors, and computer usable media 630 having computer readable code embodied therein," arguing under *WSOU Investments, LLC v. Google LLC* and *Optis Cellular Tech., LLC v. Apple Inc.* that descriptions of hardware/software implementability signals a lack of structure. On indefiniteness, Defendants argue that the flowcharts in FIG. 1-5 address only the timing of transmission (when to transmit) and not the manner of transmission once that decision is made, that MIMO signaling (claims 15, 36, 52, 57) is a collection of features rather than a disclosed algorithm, and that the specification provides no guidance for implementation. Defendants also challenge "control component" in Claim 44 on the same grounds.

The Court considers the disputed terms "control subsystem" and "control component" separately.

**a. <u>"control subsystem"</u>**

As this term lacks the word "means," there is a rebuttable presumption that § 112(6) does not apply and the claim language supports a structural reading. As explained in the analysis of Term 1, the word "subsystem" is not a categorical nonce word. Rather, its structural content depends on context. Here, the modifier "control" further distinguishes the element's structural role. In wireless transceiver architecture, "control" identifies the MAC layer decision-making block,

which is distinct from the sensing block (monitoring subsystem) and the signal-handling block (transmitting/receiving subsystem). This is not a generic invocation of the word "control." Rather, it is a compound label that, in context, identifies a recognized category of hardware and firmware performing media access control functions.

The claim also provides structural context through its recitation of the control subsystem's specific behavioral attributes and inter-component relationships. In Claims 1 and 26, the control subsystem (a) accepts network data packets from the packet-generating component, (b) determines a manner in which to transmit those packets over the channel, and (c) enables multiple simultaneous transmissions. Dependent claims add that the control subsystem prevents transmission when channel energy exceeds a threshold (claims 2, 27), delays transmission for a backoff duration (claims 3, 43, 54), determines that backoff duration and timing in relation to a timeslot (claim 7), enables MIMO signaling (claims 15, 36, 52, 57), enables spread-spectrum, space-time coding, or frequency-hopping access (claims 16, 37, 53, 58), notifies transmitting terminals of successful reception (claims 17, 25), determines whether transmission was successful and initiates retransmission (claim 18), modifies transmission manner to improve success probability (claims 19, 38), determines successful reception of multiple simultaneous transmissions (claim 24), and receives multiple simultaneous transmissions (claim 28). These are the attributes of a hardware and firmware element that governs a defined protocol, not the amorphous functional placeholder that § 112(6) is designed to cabin.

Moreover, the specification identifies control subsystem 450 as a named, distinct architectural block within a schematic block diagram of the transmitting system. The specification describes the "transmitter/receiver control subsystem 450" as "capable of determining a manner in which to transmit over the channel based on the channel state information and of determining

whether information was successfully transmitted," and as enabling multiple simultaneous transmissions. ('775 Patent at 7:29–34.) The specification further states that "[t]he control subsystem 450 implements the methods of this invention for transmitting information . . . in a protocol for transmission enabling MPR." ('775 Patent at 7:57–59.) FIG. 6 depicts control subsystem 450 as a labeled architectural block with defined interfaces to the monitoring subsystem, the transmitting/receiving subsystem, and module 460. FIGS. 1, 2, 4, and 5 provide flowcharts illustrating the transmission protocol that the control subsystem governs, supplying additional context for its position and operation within the terminal architecture.

Defendants rely heavily on the specification passage at col. 8:19–29, which discloses that in one embodiment "the transmitter/receiver control subsystem 450 includes one or more processors, and computer usable media 630 having computer readable code embodied therein capable of causing one or more processors 610 to implement the methods of this invention." From this, Defendants argue that the control subsystem can be implemented by any hardware/software combination and therefore lacks definite structure.

This argument misreads both the passage and the cases Defendants invoke. The column 8 passage describes one embodiment in which the control subsystem includes processors and memory executing code—it does not say the control subsystem can generically be "any structure that manipulates data." It discloses a particular hardware architecture of one or more processors plus computer-usable media on which software operates to implement the invention's methods. That description confirms, rather than undermines, the structural content of "control subsystem." It informs a POSITA that the claim element refers to a hardware and firmware[2] block within which

[2] Firmware and software can be used interchangeably for purposes of this analysis as firmware is simply a form of software that is permanently embedded into hardware components.

a processor may operate.

In *WSOU*, the disputed term was "a processor" configured to perform functions, and the specification's teaching that the processor could be implemented in software, hardware, or any combination triggered § 112(6) because it showed the term "processor" was not being used in its traditional structural sense but as a functional placeholder. *WSOU Invs. LLC v. Google LLC*, 2023 U.S. App. LEXIS 27763, at *7 (Fed. Cir. 2023). It does not hold that any claim element associated with a processor embodiment in the specification is thereby rendered a nonce word. Similarly, in *Optis*, the disputed term "selecting unit" was paired with a specification describing hardware or software implementation and lacked structural definition throughout. *Optis Cellular Tech., LLC v. Apple Inc.,* 139 F.4th 1363, 1383 (Fed. Cir. 2025). Neither case holds that a term with recognized structural meaning in the relevant art becomes a nonce word because the specification discloses a processor-based embodiment. The cited passage disclosing a processor and computer readable code does not transform named structural blocks into means-plus-function limitations.

Plaintiff's proffered cases are more instructive on the question of whether "control subsystem" names a structure. *See, e.g., Cellular Commc'ns Equipment v. HTC Corp.*, 2018 WL 316472, at *15 (E.D. Tex. Jan. 8, 2018) ("control unit" is "a particular type of hardware" that connotes structure). Similarly, a "control subsystem 450 [that] includes one or more processors" is a type of hardware. That it also involves firmware or software in the form of computer usable media having code embodied therein that works with the processors to perform the claimed methods does not detract from the structural nature of the system. Indeed, it is part and parcel for software to be implemented on hardware to perform computing tasks.

Extrinsic evidence also supports a finding that "control subsystems" are well-known in the art. A contemporaneous technical dictionary defines "control subsystem" as "the hardware and

software that make up a controller." *Dictionary of Computer Science, Engineering, and Technology* (2001), p. 106. This dictionary definition establishes that the compound term had a recognized structural meaning in the technical field at the time of the invention. Defendants do not dispute this definition. The extrinsic evidence clearly evidences that a POSITA would understand "control subsystem" as a term with structural content.

Expert testimony further aligns with the Court's conclusion. Plaintiff's expert, Dr. Kowalski, opines that a POSITA "would understand the control subsystem/component terms to refer to a known portion of a wireless transceiver (e.g., within the MAC architecture) that determines a manner in which to transmit packets over the wireless channel." (Dkt. No. 104-2, ¶ 56.) He further opines that the placement of the control subsystem within the transmitter architecture provides structural context, as a POSITA would understand it to operate as the MAC-layer structure that coordinates packet flow, transmission timing, parameter selection, and interaction with the physical layer. (*Id.* ¶¶ 58–59.) He states that "[a]t the time of the invention, POSITAs routinely designed and implemented such control subsystems using known MAC-layer circuitry, state machines, processors, and control logic." (*Id.* ¶ 59.)

Defendants' expert, Mr. Carpenter, does not testify that no known structural class performs MAC-layer transmission control, or that a POSITA would not recognize "control subsystem" as the name for a structural class in the context of the '775 Patent. Instead, he only states that a control subsystem is not an "off-the-shelf hardware or software component." (Dkt. No. 109-2, ¶¶ 112–113.) But that is not the standard. The question under *Williamson* is whether the term conveys sufficiently definite structure to a POSITA—not whether it refers to a commercially available component. The Court finds Dr. Kowalski's opinion to be more persuasive. A MAC-layer transmission control block is a well-recognized structural element in wireless transceiver design.

For the foregoing reasons, Defendants have failed to overcome the presumption against means-plus-function treatment. When read in context of the patent as a whole and in light of established dictionary definitions and the submitted expert testimony, the Court is persuaded that "control subsystem" connotes sufficiently definite structure to a POSITA. Section 112(6) does not apply.

**b. "control component"**

The Court now turns to consider the term "control component" in Claim 44. This claim presents a threshold defect before reaching Defendant's means-plus-function argument under Section 112(6). This is because the claim is facially problematic under 35 U.S.C. § 112(2) on multiple independent and compounding grounds, each of which independently precludes a POSITA from ascertaining the scope of the claim with reasonable certainty.

Claim 44 reads as follows, with the relevant phrases in bold:

> 44. A method for transmitting network data packets, said method comprising the steps of:
>
> sensing a communication channel, by a monitoring subsystem in a terminal, to determine whether signal energy on said communication channel exceeds a predetermined amount; and, if it has been determined that said signal energy exceeds said predetermined amount, **said control subsystem** prevents the terminal from transmitting on said communication channel;
>
> determining a manner in which to transmit network data packets over said communication channel and enabling a plurality of said network data packets to be transmitted simultaneously on said communication channel, by a **control component** in the terminal, said plurality of said network data packets being successfully transmitted simultaneously over said communication channel;
>
> transmitting signals, by a transmitting component in the terminal, on said communication channel.

The phrase "said control subsystem" appears in the first step of the method before any element called "a control subsystem" has been introduced. The claim subsequently introduces, in

the second step, "a control component in the terminal," but never introduces "a control subsystem" at all. A reference to "said" element requires prior introduction of that element in the claim. Where no antecedent exists, the claim fails to inform a POSITA of its scope with reasonable certainty.

The antecedent basis defect is compounded by the fact that Claim 44 deploys two distinct terms, "control subsystem" and "control component," in a way that makes it impossible to determine whether they refer to the same element or to different elements, and if different, where the distinctions lie.

Read on its face, the claim assigns different functions to each term. The "control subsystem" performs the prevention function: It "prevents the terminal from transmitting on said communication channel" when signal energy exceeds the predetermined amount. The "control component" performs the transmission-scheduling function: It determines "a manner in which to transmit network data packets" and enables simultaneous transmissions. These are distinct operations assigned to distinctly named elements. Under the presumption that different claim terms carry different meanings, a POSITA reading the claim in the ordinary way would conclude that "control subsystem" and "control component" are different structural elements with different roles.

Yet that reading immediately collides with the antecedent basis challenge. If the two terms denote different elements, and the claim introduces only the "control component" while referencing "said control subsystem" without ever having introduced it, then the claim would be describing a structural element that appears nowhere in its own text.

The only way to resolve that problem is to read the two terms as imparting the same meaning and treat "control subsystem" as another name for the "control component" introduced in the second step. Plaintiff took such a position at the *Markman* hearing by arguing the terms are synonymous. But that reading creates its own intractable difficulty. If the terms are

interchangeable, then the patentee used two different words in the same claim to mean the same thing, with no indication that they were intended as equivalents.

More fundamentally, a synonymous reading cannot be reconciled with the different functions the claim assigns to each term. The "control subsystem" prevents transmission when signal energy is excessive, while the "control component" determines how to transmit and enables simultaneous transmissions. These are not the same tasks. If one element performs both, the claim does not clearly say so. Indeed, Defendants argued at the hearing that the two terms must have different meanings because they perform different functions, which is the more natural reading of the claim language but reintroduces the antecedent basis problem in full.

The Court has considered the predicament and concludes that the claim presents a genuine and irresolvable dilemma. The two available interpretations each produce a fatal defect, and the claim language provides no principled basis for choosing between them. A claim whose meaning cannot be ascertained without choosing between two internally inconsistent interpretations does not "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus*, 572 U.S. at 910. The interpretive difficulty is further compounded by the fact that "control component" does not appear anywhere else in the '775 Patent and the prosecution history provides no guidance.

The antecedent and ambiguity defects are not correctable by judicial construction. Under *Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1354–57 (Fed. Cir. 2003), judicial correction is permissible only if (1) the correction is not subject to reasonable debate based on the specification and prosecution history, and (2) the prosecution history does not suggest a different correction. Both prongs must be satisfied.

Neither prong is met. As to the first prong, the competing interpretations are both facially

plausible readings of the claim language, and the parties themselves reached opposite conclusions at the hearing. As to the second prong, because "control component" appears nowhere in the intrinsic evidence outside of Claim 44, there is no basis to confirm which correction, if any, represents what the patentee intended. The Court cannot substitute its judgment for that of the patentee where the intrinsic record is silent.

Because the claim is indefinite on this ground, the Court does not reach the § 112(6) question for "control component" in Claim 44.

Accordingly, as to disputed term 3, the Court finds as follows:

**"Control subsystem" and the related control subsystem terms are not governed by 35 U.S.C. § 112(6).** The Court construes these terms according to their **plain and ordinary meaning**. No further construction is necessary.

**Claim 44 is indefinite under 35 U.S.C. § 112(2)**.

### 4. "transmitter/receiver control subsystem" & "reception/transmission control subsystem"

| Claim term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "transmitter / receiver control subsystem…"<br><br>('733 Patent, claims 16, 17, 18, 20)<br><br>"reception / transmission control subsystem"<br><br>('733 Patent, claims 29, 30) | No construction necessary; plain and ordinary meaning. Not governed by § 112 ¶ 6.<br><br>Claims 16, 17, 18, 20: In the alternative, to the extent §112, ¶ 6 is applicable, the claimed functions correspond to at least control subsystem 640 (Fig. 11) (claims 16, 17, 18, 20), including its respective interfaces and equivalents thereof. | Indefinite, means-plus-function term under pre-AIA §112, ¶6<br><br>**Function of "transmitter / receiver control subsystem…":** "modifying transmission parameters for the transmission over the communication channel and of determining whether information was successfully transmitted" (claim 16) |

| | | |
|---|---|---|
| | Although no algorithm is required, sufficient algorithmic structure is disclosed in at least Figs. 1, 5, 7 and/or 9.<br><br>Claims 29, 30:<br>In the alternative, to the extent §112, ¶ 6 is applicable, the claimed functions correspond to the receiver-side control subsystem 740 (claims 29, 30) of Figure 12, including their respective interfaces and equivalents thereof. Although no algorithm is required, sufficient algorithmic structure is disclosed in at least Figs. 2, 3 and/or 4. | "determining whether signal energy of transmissions on said communication channel exceeds a predetermined amount" (claim 16)<br><br>"preventing transmission over said communication channel, if it has been determined, by the control sub-system, that said signal energy exceeds the predetermined amount" (claim 16)<br><br>"determining whether to stop transmitting based on received feedback information" (claim 16)<br><br>"determining if transmission should stop and of rescheduling transmission, if transmission is stopped" (claim 17)<br><br>"reschedules transmission, if transmission was not successful" (claim 18)<br><br>"modify transmission parameters for the transmission over the communication channel, if a feedback transmission is detected while monitoring the feedback channel" (claim 20)<br><br>"determine whether transmission was successful, if transmission continues after modifying transmission parameters" (claim 20)<br><br>**Structure**: No structure disclosed and thus indefinite. |

| | | |
|---|---|---|
| | | **Function of "reception / transmission control subsystem":** "determining whether transmissions over a communication channel are present" (claim 29)<br><br>"initiating receipt of transmissions" (claim 29) "determining whether to stop any transmission" (claim 29)<br><br>"determining whether signal energy of transmissions over the communication channel exceeds a predetermined amount" (claim 29)<br><br>"determining whether any transmissions have been completed" (claim 29)<br><br>"determine whether at least one transmission is present in the communication channel" (claim 30)<br><br>"initiate receipt of the at least one transmission, if at least one transmission is present in the communication channel" (claim 30)<br><br>"determine whether at least some transmissions of multiple packets being transmitted simultaneously should be stopped" (claim 30)<br><br>"determine whether, if the at least one transmission is not stopped, whether transmission has been completed" (claim 30) |

| | | |
|---|---|---|
| | | "notify at least one transmitting node of outcome of determination" (claim 30)<br><br>**Structure**: No structure disclosed and thus indefinite. |

The fourth disputed term encompasses two paired groupings from the '733 Patent: "transmitter/receiver control subsystem" appearing in Claims 16, 17, 18, and 20, and "reception/transmission control subsystem" appearing in Claims 29 and 30. The '733 Patent is in the same family as the '775 Patent, sharing a provisional application filed March 15, 2005.

The parties' arguments largely track those made for the preceding term, with one added contention specific to the '733 Patent. Defendants argue that the overlap between the '733 Patent's "control subsystem" and the '775 Patent's "monitoring subsystem" in performing signal-energy detection confirms that both terms are functional nonce words. Defendant contends that the intrinsic and extrinsic record provide no distinction between what structures could serve as one but not the other, which show that both terms cover any structure capable of performing the claimed functions. For the reasons set forth below, the Court finds that § 112(6) does not apply to either term.

The Court begins its analysis by examining the claim language. Claim 16 is for a transmitter system and recites as follows, with the disputed term in bold:

16. A transmitter system comprising:

a transmitter/receiver subsystem comprising:

a transmitter/receiver portion capable of transmitting information over a communication channel and of receiving information transmitted over a feedback channel; said transmitter/receiver subsystem be capable of accessing the communication channel and the feedback channel through a physical layer; said transmitter/receiver subsystem capable of transmitting multiple packets

simultaneously and successfully receiving multiple packets over the communication channel; and

a scheduling component capable of scheduling transmission of information over the communication channel; and

a **transmitter/receiver control subsystem** modifying transmission parameters for the transmission over the communication channel and of determining whether information was successfully transmitted; said **transmitter/receiver control subsystem** determining whether signal energy of transmissions on said communication channel exceeds a predetermined amount, said **transmitter/receiver control subsystem** preventing transmission over said communication channel, if it has been determined, by the control sub-system, that said signal energy exceeds the predetermined amount; the control subsystem determining whether to stop transmitting based on received feedback information; received feedback information originates at a receiver receiving and decoding said substantially simultaneously transmitted multiple packets; said received feedback information conveying whether at least one of said substantially simultaneously transmitted multiple packets, transmitted by said transmitter system, could not be successfully decoded.

Claim 29 is for a receiver system and recites as follows, with the disputed term in bold:

29. A receiver system comprising:

a **reception/transmission control subsystem** determining whether transmissions over a communication channel are present, initiating receipt of transmissions, determining whether to stop any transmission, determining whether signal energy of transmissions over the communication channel exceeds a predetermined amount, and determining whether any transmissions have been completed;

a receiving/transmitting subsystem receiving transmissions and notifying, over a feedback channel, transmitting nodes of outcome determinations; said receiving/transmitting subsystem being capable of receiving control information from said **reception/transmission control subsystem** and receiving determinations of transmission completion and of transmission stoppage from said **reception/transmission control subsystem**; said receiving/transmitting subsystem receiving transmissions from a communication channel; said receiving/transmitting subsystem separating and decoding multiple packets transmitted simultaneously over the communication channel; and

said receiving/transmitting subsystem also transmitting, if at least one transmission is present, a feedback signal over the feedback channel, the feedback signal comprising status information for the communication channel; the receiver receiving information according to a protocol enabling multiple packets being transmitted simultaneously (multipacket reception) (MPR); transmitted feedback

> signal conveying whether one or more of said simultaneously transmitted multiple packets can not be successfully decoded; said outcomes determination comprising whether one or more of said simultaneously transmitted multiple packets can not be successfully decoded.

Again, the absence of the word "means" in both claims gives rise to a rebuttable presumption that § 112(6) does not apply, which Defendants may overcome by a preponderance showing that the term fails to recite sufficiently definite structure.

The Court first addresses Defendants' structural-overlap argument that the '733 Patent's "transmitter/receiver [or reception/transmission] control subsystem" and the '775 Patent's "monitoring subsystem" both perform signal-energy detection, and that this overlap proves both are functional placeholders.

On this point, Defendants misunderstand the architectural significance of the difference between the two patents. As the Court found in Term 1, the '775 Patent assigns the carrier-sensing and signal-energy-detection function to a dedicated "monitoring subsystem" that is architecturally distinct from the "control subsystem." The '733 Patent takes a different architectural approach. It does not separate monitoring from control into distinct subsystems. Instead, the carrier-sensing function is folded directly into the "transmitter/receiver control subsystem."

The '733 Patent specification confirms this. The patent states generally that "transmitter systems detect carrier signal energy on the data channel to determine if there are any others using the channel," (4:21–23), attributing the function to the transmitting system as a whole rather than to a dedicated sub-element. The flowchart in FIG. 5 similarly describes the monitoring action without assigning it to a distinct named subsystem.

The result is that in the '733 Patent, the monitoring function is architecturally merged into the control subsystem rather than separated into its own structural block. This is a deliberate design choice by the patentee, not evidence of functional claiming. The '733 Patent's control subsystem

is simply a more capable structural block that performs both the sensing and the transmission-management functions that the ’775 Patent distributes across two separate elements. The fact that these two patents make different architectural decisions does not render either term a nonce word. Instead, it reflects a legitimate design variation. That the monitoring aspect is integrated into the broader “transmitter/receiver control subsystem” of the transmitter system does not affect the means-plus-function consideration.

As for the rest of the analysis, the claim language provides substantial structural context. The word “subsystem” is not a blanket nonce word and “control subsystem” connotes structure in the context of the claim when read as a whole. Claim 16 recites a “transmitter system comprising” a “transmitter/receiver subsystem” that further comprises a “transmitter/receiver portion,” a “scheduling component,” and “transmitter/receiver control subsystem.” The three elements interact through defined functional relationships. The “transmitter/receiver control subsystem,” in particular, modifies transmission parameters, determines whether information was successfully transmitted, performs carrier sensing to determine whether signal energy exceeds a predetermined threshold, prevents transmission when the threshold is exceeded, and determines whether to stop transmitting based on received feedback information. These are not abstract functional descriptions with no structural context. They are attributes of a named element operating within a defined transceiver architecture alongside named co-components.

Similarly, Claim 29 recites a “receiver system comprising” a “reception/transmission control subsystem” that can receive information from a “communication channel” and make determinations about how to handle transmissions. The “reception/transmission control subsystem” is one of several components that inputs into a “receiving/transmitting subsystem” that

then sends transmissions over a "feedback channel" to convey information about the transmission state. Nothing about it is an abstraction either.

Notably, Defendants have withdrawn their § 112(6) challenges to the "transmitter/receiver subsystem" which implies that the subsystem, at least, connotes sufficiently definite structure. The challenged "transmitter/receiver control subsystem" operates within the same disclosed architecture as the "transmitter/receiver subsystem."

The directional modifiers "transmitter/receiver" and "reception/transmission" also carry structural weight beyond merely locating the control subsystem. These qualifiers identify which side of the transceiver the control subsystem governs, the transmission side (claims 16–20) versus the reception side (claims 29–30), and correspond to the two distinct structural implementations disclosed in the specification, control subsystem 640 (transmitter-side, FIG. 11) and control subsystem 740 (receiver-side, FIG. 12). The modifiers are not merely directional labels. They map the claim terms to distinct structural blocks in the patent's disclosed architecture.

Moreover, dependent claims define additional structure. Dependent claims 20 and 30 provide the "transmitter/receiver control subsystems" and "reception/transmission control subsystem" comprise a processor and computer usable medium having computer readable code. Thus, the claims recite a specific hardware architecture within which the control subsystem operates.

The specification lends even more support. For the transmitter-side term, Figure 11 depicts control subsystem 640 as a labeled, distinct architectural block connected to the transmitter/receiver subsystem 630, which in turn includes the transmitter/receiver portion 634 and scheduling component 637, both capable of accessing the communication and feedback channels through a physical layer. (*See also* '733 Patent at 10:41–44 and 10:67–11:5.) For the receiver-side

term, Figure 12 depicts control subsystem 740 as a labeled receiver-side architectural block with defined interfaces to the receiving/transmitting subsystem 730 and its components. (*See also* '733 Patent at 11:39–45 and 11:56–61.) In addition, the control subsystems are cross-referenced to the prior-art CSMA transceiver structures incorporated by the transmitter/receiver portion 634, including U.S. Pat. Nos. 6,157,616 and 6,181,683 and the Kleinrock/Tobagi reference, confirming that the structural predecessor of each control subsystem was a recognized hardware block in the prior art. (*See also* discussion of other known control subsystems capable of implementing time-slot embodiments, '733 Patent at 10:53–11:22.) Thus, the patent as a whole confirms that the control subsystem and its various functions were understood to map to known structures.

The extrinsic evidence that supported the structural finding for "control subsystem" in Term 3 also applies here. The technical dictionary defines "control subsystem" as "the hardware and software that make up a controller."[3] *Dictionary of Computer Science, Engineering and Technology* (2001), p. 106. Cases recognizing structural content in transceiver-related terms further confirm the structural reading. *EnOcean GmbH v. Face Int'l Corp.*, 742 F.3d 955, 959 (Fed. Cir. 2014) (the term "receiver" "presumptively connotes sufficiently definite structure to those of skill in the art"); *see also, Huawei Techs. Co. v. T-Mobile US, Inc.*, 2017 WL 2267304, at *10–13 (E.D. Tex. 2017) (recognizing that "receiver" and "transmitter" used in networking and communications contexts may connote structure to a POSITA).

---

[3] Defendants contend that this dictionary definition is inapposite because the '733 Patent does not require the control subsystem to be implemented as a combination of hardware and software. That contention is directly refuted by Claims 20 and 30, which provide that the transmitter/receiver control subsystem comprises "at least one processor" and "at least one computer usable medium having computer readable code embodied therein"—a hardware and software combination that maps precisely to the dictionary definition.

Dr. Kowalski opines that a POSITA would understand the "transmitter/receiver control subsystem" and "reception/transmission control subsystem" to correspond to transmitter-side and receiver-side MAC-layer control structures, respectively, within a wireless transceiver architecture, and that such structures were well known and routinely implemented at the time of the invention. (Dkt. No. 104-2, ¶¶ 99–100.) In contrast, Mr. Carpenter does not state that no known structural class performs MAC-layer transmission or reception control, or that a POSITA would fail to recognize these terms as structural within the '733 Patent's architecture. His objection, as in Term 3, is that the control subsystem is not an off-the-shelf component—a standard that § 112(6) does not impose.

After weighing the evidence, the Court finds that Defendants have not overcome the presumption against means-plus-function treatment. The intrinsic and extrinsic evidence all establish that "transmitter/receiver control subsystem" and "reception/transmission control subsystem" connote sufficiently definite structure to a POSITA. Section 112(6) does not apply, and no corresponding structure or algorithm analysis is required.

For the foregoing reasons, the Court finds that **"transmitter/receiver control subsystem" and "reception/transmission control subsystem" are not governed by 35 U.S.C. § 112(6).** The Court construes both terms according to their **plain and ordinary meaning**. No further construction is necessary.

**5. "control sub-system"**

| Claim term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "control sub-system"<br><br>('733 Patent, Claims 1, 4, 41) | No construction necessary; plain and ordinary meaning. Not governed by § 112 ¶ 6.<br><br>In the alternative, to the extent §112, ¶ 6 is applicable, the claimed functions correspond to the transmitter-side control subsystem 640 (claims 1, 41) and receiver-side control subsystem 740 (claim 4) including their respective interfaces, and equivalents thereof. Although no algorithm is required, sufficient algorithmic structure is disclosed in at least Figs. 1, 5, 7 and/or 9 (claims 1, 41) and Figs. 2, 3 and/or 4 (claim 4). | Indefinite, means-plus-function term under pre-AIA §112, ¶6<br><br>**Function**:<br>"determining . . . whether signal energy of transmission on said communication channel exceeds a predetermined amount"<br><br>"preventing transmission over said communication channel, if it has been determined . . . that said signal energy exceeds the predetermined amount"<br><br>"determining . . . whether signal energy of transmissions over the communication channel exceeds a predetermined amount"<br><br>"delaying transmission for a backoff duration, if it has been determined . . . that said signal energy exceeds the predetermined amount, and allowing accessing said communication channel after said backoff duration" (claim 41)<br><br>**Structure**: Indefinite. |

The last disputed term is "control sub-system" (hyphenated), appearing in Claims 1, 4, and 41 of the '733 Patent. The parties raise no new arguments beyond those presented in Terms 3 and

4. The legal analysis is thus the same. The only issues specific to this term are whether the hyphenated spelling of "sub-system" designates a structurally distinct concept from the unhyphenated "subsystem" previously addressed and whether omitting the modifier "transmitter/receiver" changes the scope. The Court answers both in the negative and finds that § 112(6) does not apply for the same reasons as the preceding terms.

Although the '733 Patent uses "control sub-system" in method claims 1, 4, and 41, and "transmitter/receiver control subsystem" in system claims 16–20 and "reception/transmission control subsystem" in system claims 29–30, there is no material difference in the scope of the terms for purposes of this analysis. Like in claims 16 and 29, the "control sub-system" in claim 1 is a component responsible for determining whether signal energy of transmissions on the communication channel exceeds a predetermined amount and, if so, taking an action to control transmissions. The functional equivalence of these terms is confirmed by the specification, which refers to "transmitter/receiver control subsystem 640" and "control subsystem 640" interchangeably throughout columns 10-11 when describing the same structural element. Indeed, there is no disclosure in the specification (and no argument from any party) that the variants denote different components or different structural concepts despite one appearing in method claims and the other in system claims. The Court thus treats "control sub-system" as equivalent to "control subsystem" for purposes of the § 112(6) analysis as they have the same underlying structure disclosed in the specification and in FIGS. 11 and 12. The same extrinsic evidence in the form of contemporaneous dictionary definition and expert testimony likewise applies.

The § 112(6) analysis for "control sub-system" is governed by the framework applied in Terms 3 and 4. The Court incorporates by reference its analysis above and reaches the same

conclusion. Defendants have failed to overcome the presumption against means-plus-function treatment.

Accordingly, the Court finds that **"control sub-system" is not governed by 35 U.S.C. § 112(6).** The Court construes the term according to its **plain and ordinary meaning**. No further construction is necessary.

## V. CONCLUSION

The Court adopts the constructions as set forth in this opinion for the disputed terms of the Asserted Patents.

The parties are **ORDERED** that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**SIGNED this 10th day of April, 2026.**

Roy S. Payne
ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE